IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


BOBBY R. DURHAM,
      Petitioner,

vs.                                                            Case No. 3:06cv196/RV/EMT

WALTER A. McNEIL,[1]
      Respondent.
_____/

### ORDER, REPORT AND RECOMMENDATION

      This cause is before the court on Petitioner's petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (Doc. 1).  Respondent filed an answer to the petition with relevant portions of the state court record, and Petitioner filed a reply (Docs. 13, 16).

      The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N. D. Fla. Loc. R. 72.2(b).  After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

      The relevant aspects of the procedural background of this case are undisputed and established by the state court record (*see* Doc. 13, Exhibits; Doc. 16 at 1).  Petitioner was charged in the Circuit Court in and for Okaloosa County, Florida, with one count of capital sexual battery upon a person less than twelve years of age by vaginal penetration by the penis or fingers or both, one count of

---

[1]Walter A. McNeil succeeded James McDonough as Secretary for the Department of Corrections, and is automatically substituted as Respondent.  *See* Fed. R. Civ. P. 25(d)(1).

lewd and lascivious assault of a child under the age of sixteen (16) years, and one count of lewd and lascivious molestation of a child under the age of twelve (12) years (Doc. 13, Ex. A).  The victim was Petitioner's daughter, who was three to five years old at the time of the offenses (*id.*). Following a jury trial, Petitioner was found guilty as charged (Doc. 13, Ex. C).  On March 5, 2001, Petitioner was adjudicated guilty and sentenced to life imprisonment without the possibility of parole on the sexual battery count, and two concurrent terms of fifteen (15) years of imprisonment on the remaining two counts, to run consecutively to the life term, with 396 days of pre-sentence jail credit (*id.* at 367–68, 370–75).

Petitioner appealed the judgment to the Florida First District Court of Appeals ("First DCA").  On May 2, 2002, the First DCA affirmed the judgment of conviction, with the mandate issuing May 20, 2002 (Doc. 13, Exs. D, E, F).  <u>Durham v. State</u>, 815 So. 2d 745 (Fla. 1st DCA May 2, 2002).  Petitioner did not seek certiorari review by the Florida Supreme Court or the United States Supreme Court.

On June 4, 2002, Petitioner filed a petition for writ of habeas corpus seeking a belated appeal in the First DCA, which was denied by the court on July 10, 2002 (Doc. 13, Ex. G).  <u>Durham v. State</u>, 823 So. 2d 767 (Fla. 1st DCA July 10, 2002) (Table).

On January 11, 2003, Petitioner filed a motion for postconviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Doc. 13, Ex. H).  Following an evidentiary hearing, the trial court denied the motion (Doc. 13, Exs. I, J).  Petitioner appealed the decision to the First DCA (Doc. 13, Exs. K, L, M), and the appellate court affirmed per curiam without written opinion on October 28, 2005, with the mandate issuing January 23, 2006 (Doc. 13, Exs. N, O). <u>Durham v. State</u>, 917 So. 2d 867 (Fla. 1st DCA Oct. 28, 2005) (Table).

On April 28, 2006, Petitioner filed the instant habeas action (Doc. 1 at 7).  Respondent concedes that the petition is timely, and the grounds raised herein were exhausted or "technically exhausted" in the state courts (Doc. 13 at 2–4, 5, 13, 19, 26, 32, 40, 47, 53, 59).

II.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As

the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19.  In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing

---

[2]Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

> legal principle from this Court's decisions but unreasonably applies that principle to
> the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case."  Neelley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'"  Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06).  The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06).  If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  Williams, 529 U.S. at 409.  Whether a State court's decision was an

unreasonable application of legal principle must be assessed in light of the record the court had before it.  Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); cf. Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001).  The State court's incorrect or erroneous application of clearly established law will be held to be reasonable and not warrant a writ so long as the State court adjudication results in a "satisfactory conclusion."  Williams, 529 U.S. at 410–12.

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); see e.g. Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims.  *See* Panetti v. Quarterman, 551 U.S. 930 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same).  The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).

Within this framework, the court will review Petitioner's claims.

III.    PETITIONER'S CLAIMS

    A.    Ground One:  "Denial of effective assistance of counsel in failure to move for defense expert, resulting in violation of 5th, 6th, and 14th U.S. Const. Amendment rights to fair trial, due process, and effective assistance of counsel."

Petitioner contends he received ineffective assistance of counsel because defense counsel failed to investigate the State's medical evidence (Doc. 1 at 5).  Petitioner states Dr. Lynn Keefe performed a physical examination of the child victim and determined that the absence of the posterior rim of the child's hymen was indicative of long-term sexual abuse (*id.*).  Petitioner acknowledges that counsel testified during the post-conviction evidentiary hearing that he made a tactical decision not to procure an independent medical expert to re-examine the victim because there was no basis to question the findings of Dr. Keefe, and the findings and conclusions of an expert would have been discoverable by the State and, if unfavorable, would have provided the State with more evidence (*id.* at 6b–6d).  However, Petitioner contends this tactical decision was unreasonable because a defense expert's findings and opinions would not have discoverable by the State unless the expert testified at trial (*id.* at 6c, 6e).  Petitioner further states that a basis for further investigation of Dr. Keefe's conclusions existed because Dr. Keefe's findings in her report to law enforcement, as described to Petitioner by a detective who interrogated him, conflicted with her trial testimony in that she purportedly stated in her report that during her examination of the victim she observed contusions, bruising, redness, seeping vaginal fluids and attenuation of the hymen, but she testified at trial that she did not observe any discharge, and "the membranes appear pink and non-irritated"  (*id.* at 6d).

    1.    Clearly Established Supreme Court Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  466 U.S. at 687–88.  If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  Id. at 697.  Thus, this court need not address the prejudice prong if the court determines that the performance prong is not satisfied.  Turner v. Crosby, 339 F.3d 1247, 1279 (11th Cir. 2003); Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.") (citation omitted).

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one."  Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)).  The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms."  Strickland, 466 U.S. at 688–89.  "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Id. at 689.  If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do."  Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314–15 n.15).  Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so."  Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994).  Counsel's performance is deficient only if it is "outside the wide range of professional competence."  Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. 690–91.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  *Id.* at 691.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.  *Id.*  "One of the primary duties defense counsel owes to his client is the duty to prepare himself adequately prior" to a legal proceeding.  Lawhorn v. Allen, 519 F.3d 1272, 1295 (11th Cir. 2008) (quoting Magill v. Dugger, 824 F.2d 879, 886 (11th Cir. 1987)).  Such preparation includes an understanding of the legal procedures and the legal significance of tactical decisions within those proceedings.  Young v. Zant, 677 F.2d 792, 794, 799-800 (11th Cir. 1982) (an attorney's reliance on former law and unawareness of procedure deprived his client of effective assistance).  Tactical or strategic decisions based on a misunderstanding of the law are unreasonable.  Hardwick v. Crosby, 320 F.3d 1127, 1163 (11th Cir. 2003); *see also* Horton v. Zant, 941 F.2d 1449, 1462, 1463 (11th Cir.1991) (counsel's "tactical decision" to present no mitigating evidence during the sentencing phase was "unreasonable" when it was based on a misinterpretation of the law and the failure to evaluate alternative paths); Jackson v. Herring, 42 F.3d 1350, 1367–68 (11th Cir. 1995) (counsel's strategic decision was not reasonable as it was "unsupported by sufficient investigation" and information "of the available options").

Counsel's decision whether to call a particular witness is a matter of trial strategy entitled to great deference.  Chandler, 218 F.3d at 1314 n.14 (citing Waters v. Thomas, 46 F.3d 1506, 1512, 1518-19 (11th Cir. 1995) (en banc)).  "The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." Waters, 46 F.3d at 1514.  "Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and

because allegations of what a witness would have testified are largely speculative." Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978).[3]

   2. Federal Review of State Court Decision

  Petitioner raised this claim as Ground One in his Rule 3.850 motion (Doc. 13, Ex. H at 5–8).[4] In the state court's written opinion denying Petitioner's Rule 3.850 motion, the state court identified Strickland as setting forth the controlling legal standard for analyzing claims of ineffective assistance of counsel (Doc. 13, Ex. I at 185). Because the state court correctly identified Strickland as the governing precedent, Petitioner is entitled to federal habeas relief only if he demonstrates that the state court decision was based upon an unreasonable determination of the facts or that the state court decision was an unreasonable application of Strickland.

  The state court found as fact that, based upon defense counsel's testimony at the evidentiary hearing, counsel discussed with Petitioner the fact that he did not have any basis to have the child victim re-examined (Doc. 13, Ex. I at 184). The court additionally found that Petitioner introduced no evidence to support his allegation that Dr. Keefe's medical conclusions or opinions were inaccurate (id. at 185). Therefore, Petitioner's speculative allegations were insufficient to satisfy either the deficient performance or prejudice prong of the Strickland standard (id.).

  The transcript of the evidentiary hearing shows that Petitioner testified he and Mr. Tongue, Petitioner's defense counsel during his criminal trial, never discussed contesting the report of Dr. Keefe (Doc. 13, Ex. J at 448). On cross-examination, the State asked Petitioner whether he recalled discussing with Mr. Tongue the issue of whether an independent medical expert should be hired to review Dr. Keefe's findings and re-examine the victim, and Petitioner responded that he did not recall that conversation (id. at 469). He additionally testified that based upon the information he read in certain medical journals, some women are born without a hymen, and there was a possibility that another medical expert could have determined that his daughter was born without a hymen,

---

[3]In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all former Fifth Circuit decisions rendered before October 1, 1981.

[4]Citations to page numbers refer to the page numbers appearing on the bottom right of each page of the state court record.

thereby refuting Dr. Keefe's testimony that the absence of the victim's hymen was evidence of long-term sexual abuse (*id.* at 469–73).

The defense called Timothy Hilley, an attorney appointed by the court as an expert in the field of criminal defense, as a witness at the evidentiary hearing.  With regard to Mr. Hilley's qualifications as an expert, Mr. Hilley testified that he had been practicing in the area of criminal defense for approximately five (5) years, and Mr. Tongue had trained him as a felony attorney in the public defender's office (*id.* at 511, 513).  He testified that during his five years of practice, he handled at least one case involving a charge of child molestation where the child was less than twelve years of age, but he never tried a case of that type to a jury (*id.* at 514–16).  He further testified that during his practice, he had deposed Dr. Keefe twice (*id.* at 519).  Mr. Hilley testified that if he had been Mr. Tongue, he would have filed a motion requesting appointment of a medical expert because when a State expert uses medical terms, he does not take for granted that he understands the meaning of those terms (*id.* at 504).  He testified that when he believes "there's an issue there," he contacts an expert to "make that issue as far as a defense" (*id.* at 505).  Mr. Hilley also testified that when a defense expert is hired or appointed by the court, the expert is not necessarily divulged to the State unless the defense chooses to use the expert as a witness at trial (*id.* at 505–06).  He testified that before Petitioner's counsel could decide whether to concede that the victim was sexually molested, he needed an independent expert to review Dr. Keefe's notes and render an opinion as to whether there was another explanation for the physical evidence; although Mr. Hilley conceded that he may not have requested that the defense expert conduct a physical re-examination of the child (*id.* at 506–08).  Mr. Hilley testified that Mr. Tongue's failure to obtain an expert could not have been a decision relating to trial strategy because a trial strategy conceding that the victim was sexually molested could not be developed unless Mr. Tongue determined that the child had actually been molested, which only an independent medical expert could determine (*id.* at 510).

On cross-examination by the State, Mr. Hilley conceded that he was unaware of any case law that permitted the defense in a child molestation case to have a defense medical expert actually examine the victim without disclosing the results to the State (*id.* at 518).

Mr. Tongue testified that he had been practicing law for twenty-four (24) years, and he had been practicing exclusively in the area of criminal defense for fourteen (14) of those years (*id.* at 524–25).  He testified that he had handled at least six (6) capital sexual battery cases, that is, sexual battery on a child under the age of twelve by a perpetrator over the age of eighteen (*id.* at 526).  He testified that he had deposed Dr. Keefe on numerous occasions in the past, and he had interviewed and deposed other medical experts on child molestation issues (*id.* at 526–27).  He testified that he never had any reason to question Dr. Keefe's qualifications or conclusions, and he never found her work lacking (*id.* at 527).  Mr. Tongue testified that he did not believe he had a predicate or foundation for requesting a re-examination of the child victim by another medical expert (*id.* at 528).  He further testified that if he had requested a re-examination, it would have been discoverable by the State (*id.*).  He testified that he showed Petitioner the report by Dr. Keefe and told him that he did not have any reason to question it (*id.*).  He also advised Petitioner that from a tactical perspective, their requesting another examination of the child may result in creating another witness for the State, and Petitioner agreed that there was no reason to question Dr. Keefe's report (*id.* at 528–29).

On cross-examination, Mr. Tongue testified that in other cases, he was able to have confidential experts appointed for the defense, but he did not believe he could have had a confidential expert appointed in Petitioner's case because in this particular case, re-examination of the victim would have been necessary to obtain a meaningful opinion as to the accuracy of Dr. Keefe's report (*id.* at 534–35).  Mr. Tongue testified that he believed there was case law dictating that such a re-examination could not be confidential, and he had previously litigated the issue of whether such a re-examination could be kept confidential and was unsuccessful (*id.* at 535).

Initially, the Eleventh Circuit has stated that whether an attorney has rendered ineffective assistance of counsel is not a matter subject to expert testimony; rather, it is "a question to be decided by the state courts, by the district court, and by this Court, each in its own turn."  *See* Freund v. Butterworth, 165 F.3d 839, 846 n.34 (11th Cir. 1999) (quoting Provenzano v. Singletary, 148 F.3d 1327, 1332 (11th Cir. 1998)).  Therefore, Mr. Hilley's opinion as to the reasonableness of Mr. Tongue's decision not to seek the services of an independent medical expert has no bearing on this court's determination of the reasonableness of counsel's performance.  Additionally, even assuming

trial counsel was deficient for failing to consult with or request appointment of a medical expert, Petitioner failed to show a reasonable probability that the result of his trial would have been different if defense counsel had procured an independent medical expert to provide an opinion as to the cause of the victim's physical condition, that is, the absence of a hymen or remnants thereof. Although Petitioner testified at the post-conviction hearing that he read medical publications stating that some females were born without a hymen, and there was a possibility that another medical expert could have determined that his daughter was one of those females, this testimony falls far short of establishing a reasonable probability that another expert would have determined that Dr. Keefe's opinion was inaccurate or that another expert would have uncovered any evidence favorable to the defense.

Furthermore, although Petitioner asserts that there were inconsistencies in Dr. Keefe's report and her trial testimony, his allegation is unsupported. During her trial testimony, Dr. Keefe testified that the victim's hymen was attenuated, but there was no vaginal bleeding, bruises or scrapes (Doc. 13, Ex. B at 230, 232). Petitioner states Detective Curtis Pond told him that Dr. Keefe found tears, scarring, bruising, irritation, and seeping vaginal fluid when she examined the victim, but there is no evidence that Detective Pond's description of the content of Dr. Keefe's report was accurate. Additionally, although a mental health expert included the following statement in his report, "Dr. Keefe further described the damage as attenuated with seeping vaginal fluid which is consistent with penetration," this is not inconsistent with Dr. Keefe's trial testimony. The state court thus objectively reasonably concluded that Petitioner failed to satisfy his burden of demonstrating that he was prejudiced by defense counsel's failure to consult with or request appointment of an independent medical expert. Accordingly, the undersigned concludes that the state court's denial of Petitioner's claim was not contrary to or an unreasonable application of Strickland, nor was it based upon an unreasonable determination of the facts in light of the evidence presented in the state post-conviction proceeding.

       B.    Ground Two: "Denial of effective assistance of counsel in failure to object to numerous improper prosecutorial comments in violation of 5th, 6th, and 14th U.S. Const. Am. rights to fair trial, due process, effective assistance of counsel."

Petitioner contends he received ineffective assistance of counsel because defense counsel failed to object to several comments by the prosecutor during closing argument and during the prosecutor's cross-examination of Petitioner at trial (Doc. 1 at 5, 6f–g).  Petitioner contends the comments, specifically identified in the following discussion, improperly shifted the burden of proof to the defense, mischaracterized the evidence, improperly bolstered witness testimony, and improperly appealed to and inflamed the emotions of the jury (*id.*).  Petitioner states that in addition to the comments specifically identified in his federal petition, he cited additional comments in his Rule 3.850 motion, and he requests that this court review those comments as well (*id.* at 6g).  The court will not consider claims that are not properly before it.  To properly raise a claim of ineffective assistance of counsel based upon counsel's failure to object to a comment by the prosecutor, Petitioner must identify the allegedly objectionable comment in his federal petition or in a supporting memorandum.  In the instant case, Petitioner identified only nine (9) allegedly improper comments in his federal petition; therefore, the undersigned concludes that Petitioner properly raised a claim of ineffective assistance of counsel only as to the nine comments discussed *infra*.

        1.        Clearly Established Supreme Court Law

The clearly established Supreme Court law applicable to claims of ineffective assistance of counsel is set forth *supra*.

        2.        Federal Review of State Court Decision

Petitioner raised this claim as Grounds Three and Four in his Rule 3.850 motion (Doc. 13, Ex. H at 25–34).  The state court determined that the prosecutor's statements during closing argument were fair comments on the evidence adduced at Petitioner's trial (Doc. 13, Ex. I at 185).  With regard to Petitioner's claim that the prosecutor made an improper comment during his cross-examination of Petitioner, the state court determined that the record conclusively refuted Petitioner's claim (*id.*).  Therefore, defense counsel's failure to object to the comments did not constitute deficient performance (*id.*).

        a.        <u>Burden-shifting comments</u>

Petitioner identifies the following two statements as improperly shifting the burden of proof from the prosecution to the defense:  (1) "Bobby Durham molested his daughter, because there's

absolutely no evidence to the contrary, none whatsoever other than Bobby Durham's incredulous statement" and (2) "[t]he defendant himself has proven he's guilty, because there's nothing to show, nothing—no reason to believe, there's no way to conclude or even suspect that anyone else could have done this." (*id.* at 5, 6f).

The trial transcript shows that defense counsel had first and last closing arguments.  In his first closing argument, defense counsel argued that there was insufficient evidence that Petitioner sexually abused the victim because the only witness to the sexual abuse was the victim, and because of her age, intellect, and development, her testimony was essentially of no value (Doc. 13, Ex. B at 316).  Counsel further argued that the State's failure to eliminate other possible perpetrators, such as the victim's cousin Michael, who the victim's mother testified exposed his buttocks and genitals to the victim, created reasonable doubt as to Petitioner's guilt.  Counsel also argued that inconsistencies in statements by the victim and her mother indicated that they were not credible or reliable witnesses, which created reasonable doubt as to Petitioner's guilt (*id.* at 316–17).

The prosecutor then argued the following:

> It's hard or difficult . . . to make a decision about something that you don't know, that you haven't had evidence or proof of.  It is the same challenge sometimes that when we know the outcome is unpleasant, the decision that we have to make is unpleasant . . . that we have to look at the evidence and the facts and accept them for what they are and make the decision based on what we have, and not speculate or conjecture about what we don't have.  Defense counsel would like you to do that. They would like you to make a decision based on what you don't know, on what you do not have.
>
> The State feels very confident that there is plenty of evidence and facts and information sitting right in your lap that should make it very obvious, painfully so, that Bobby Durham molested his daughter, because there's absolutely no evidence to the contrary, none whatsoever other than Bobby Durham's incredulous statement that he made himself on the stand, despite the fact that he says only he or his wife could have done this.  Now we can look at that for a moment and consider the reference to Michael, but that is without grasping, reaching, last ditch effort [sic] to save himself from the perils of the charge.
> . . . .
> There's no one else that could have done that [repeatedly sexually abused the victim over an extended period of time] but that man sitting right over there, no one.  If it had happened in the seven to eight weeks that they were in South Carolina . . . . Dr. Keefe said no, not without some severe symptoms, blood, things in her clothes, pain.

> . . . [T]he reason you know it wasn't Michael is that it all started before then, before
> they went to South Carolina.

(*id.* at 318–19, 322).  The prosecutor replayed portions of the victim's recorded statements to law

enforcement which had been admitted as evidence, and recited the elements of each offense with

which Petitioner was charged (*id.* at 324–53).  The prosecutor then stated:

> The defendant himself has proven that he's guilty because there's nothing to
> show, nothing—no reason to believe, there's no way to conclude or even suspect that
> anyone else could have done this.  It all happened long before South Carolina.  In
> your search for the truth you're traveling down this path, and you're going to get to
> the end of that path.  That stuff about Michael, that's just an imaginary bolder [sic],
> if you will, or a tree that's been put in your path by Bobby Durham.  You have to go
> through that, over that, around that, you have to put that behind you and move on
> down the path, because it's impossible for Michael Primous to have done this. . . .
> We're not relying on [the victim's] hearsay.  We're relying on a medical fact that it
> took months, if not years for this to have occurred, to be this severe.  That's what
> we're relying on, objective, irrefutable, criteria. . . . Certainly he [Petitioner] did
> these acts, the damage is done. . . . A reasonable doubt is not a speculative doubt or
> an imaginary doubt or a forced doubt, it's something that prevents you from
> believing the defendant committed this crime, and there is nothing in existence that
> should do that.

(*id.* at 353–55).

Upon review of the context of the prosecutor's comments, the undersigned concludes that

the comments did not have the effect of shifting burden of proof.  The prosecutor told the jury that

there was no basis for reasonable doubt as to whether Petitioner committed the crimes, not that

Petitioner was required to present evidence or that he had any burden to prove that anyone else

committed them.  Therefore, Petitioner failed to demonstrate that counsel's failure to object to the

comments on the ground that the comments shifted the burden of proof to the defense was

objectively unreasonable.  *See* United States v. Paul, 175 F.3d 906, 912 (11th Cir. 1999)

(prosecutor's comment that the defense had resources and had the opportunity to produce evidence

themselves did not shift burden of proof to the defense; prosecutor told jury that defendant had

opportunity to produce handwriting expert to rebut State witness's testimony, not that defendant had

any burden to produce rebuttal expert); United States v. Blackman, 66 F.3d 1572, 1578–79 n. 7 (11th

Cir.1995) (while a prosecutor may not comment about the absence of witnesses or otherwise attempt

to shift the burden of proof, it is not improper for a prosecutor to note that the defendant has the

same subpoena powers as the government, "particularly when done in response to a defendant's argument about the prosecutor's failure to call a specific witness."). Furthermore, the prosecutor reminded the jury that before they could find Petitioner guilty, the State was required to prove the elements of the crimes by presenting evidence (Doc. 13, Ex. B at 349–50), and defense counsel reminded the jury that the State bore the burden of proof, and Petitioner did not have to prove anything (*id.* at 304–05, 310–11), thus dispelling any suggestion that Petitioner was required to present any evidence or bear any burden of proof.  Moreover, the trial court cured any suggestion that anyone but the State had the burden of proof by clearly instructing the jury on the following points:  (1) to convict Petitioner, the State was required to prove the elements of each crime beyond a reasonable doubt, (2) Petitioner was not required to present evidence or prove anything, (3) if the jury had a reasonable doubt as to whether Petitioner committed the offenses, they should find him not guilty, (4) a reasonable doubt as to guilt could arise from the evidence, conflict in the evidence, or lack of evidence, and (5) it was the jury's duty to decide what evidence was reliable (*id.* at 359–65).  Therefore, Petitioner has failed to show a reasonable probability that the outcome of the proceeding would have been different if counsel had objected to the comments.

> b.      Comments that mischaracterized the evidence, improperly bolstered witness testimony, and improperly appealed to and inflamed the emotions of the jury

Petitioner additionally contends  that several statements by the prosecutor mischaracterized the evidence, improperly bolstered witness testimony, and improperly appealed to the jury's emotions.  The role of the attorney in closing argument is "to assist the jury in analyzing, evaluating and applying the evidence. . . . The assistance permitted includes counsel's right to state his contention as to the conclusions that the jury should draw from the evidence."  United States v. Morris, 568 F.2d 396, 401 (5th Cir. 1978).  To the extent an attorney's closing argument ranges beyond this boundary it is improper.  *Id.*  Except to the extent the attorney bases any opinion on the evidence in the case, the attorney may not express a personal opinion on the merits of the case or the credibility of witnesses.  *See* United States v. Garza, 608 F.2d 659, 663 (5th Cir. 1979) (citations omitted). Furthermore, an attorney may not suggest that evidence which was not presented at trial provides additional grounds for finding defendant guilty.  *Id.* (citations omitted).

1.      Comment regarding doll

The first allegedly objectionable comment was the prosecutor's comment that Dr. Napier testified that the doll used by the person who interviewed the child victim was not an anatomically correct doll (Doc. 1 at 6f).  Petitioner states Dr. Napier's actual testimony was that he could not tell if the doll was anatomically correct (*id.*).

According to the trial transcript, Dr. Napier's actual testimony was the following:

> Q.      . . . was there any indications [sic] that that was an anatomically correct doll?

> A.      I don't think it was.  I couldn't tell because of the quality of the tape, but I got no indication that the doll was anatomical, nor did I get any indication that the child had an unusual response to the doll which would also indicate that it was not anatomical.

(Doc. 13, Ex. J at 168).  The prosecutor's statement was a fair interpretation of Dr. Napier's testimony that he did not believe an anatomically correct doll was used in the interview.  Therefore, Petitioner failed to demonstrate that counsel's failure to object to the comment was unreasonable.

2.      Comment regarding excessive masturbation

The second allegedly objectionable comment was the prosecutor's comment that Dr. Napier testified that excessive masturbation was an indication of sexual abuse (Doc. 1 at 6f).  Petitioner contends this was a mischaracterization of the evidence because Dr. Napier never testified that excessive masturbation indicated sexual abuse, and there was no evidence that the child victim engaged in excessive masturbation (*id.*) (emphasis in original petition).

The trial transcript shows that the victim's mother testified that she observed the five-year old victim "lying on her back with her back bent up making moaning sounds," playing with her genitals, sitting on a toy and rocking back and forth, putting a toy hot dog near her vaginal area, putting "rolled up toilet paper like a penis . . . inside of her mouth back and forth," and crossing her legs and "hump[ing] up and down" in her sleep or when she's by herself (Doc. 13, Ex. B at 25–28). The victim's mother also testified that the victim "couldn't sleep" (*id.* at 53).  Dr. Napier testified that a child's response to abuse is "very personal," and that some children exhibit "major trauma, depression, anxiety, not sleeping, sexual acting out, sexual preoccupation, even becoming a perpetrator" (Doc. 13, Ex. B at 172).  He also testified that the fact that the child was displaying

some sexual acting-out behavior, and her behavior discontinued when she and Petitioner were separated, was consistent with abuse (*id.* at 169).

During closing argument, defense counsel argued the following:

> When asked by the State why she long suspected Mr. Durham of some sort of sexual misconduct and why she believed that those incidents she described by [the victim] that was, as I recall, sitting on the head of a stuffed rabbit and rocking back and forth, placing a toy hot dog near her vaginal area, and doing something with her mouth and a rolled up toilet paper roll, why she felt that those things were indicative of some sexual abuse or why they were sexual in nature, she couldn't give us any answer. I'm going to ask you to look at your own experiences in life, use your own common sense, and ask whether or not you believe that beyond a reasonable doubt those are indicators of sexual abuse. I submit that they are not in and of themselves indicators of anything other than a child's curiosity and a mother's, perhaps in this case a hypersensitive mother's, interpretation.

(Doc. 13, Ex. B at 306).

The prosecutor responded to defense counsel's argument as follows:

> The defense would have you think that she didn't have any symptoms or acting out or that the acting out was not indicative of sexual abuse. That's not what Dr. Napier said. Dr. Napier talked about sexually acting out and excessive molestation—or excessive masturbation as an indicator of sexual abuse, and we know the child was sexually abused. That's not even a question for the jury to even ponder more than a second because this child has no hymen. Dr. Keefe stood right here and told you this morning, "It's gone", and not gone from one time, or two times, or three, or four, or five, or six, or seven, or eight, or nine, from months of repeated abuse, over and over and over, a little bit at a time, wearing away the tissue a little bit at a time.

(Doc. 13, Ex. B at 321–22). Although the prosecutor's comment was not a verbatim recitation of Dr. Napier's testimony, it was a fair comment on Dr. Napier's testimony that sexual acting out and sexual preoccupation were behaviors exhibited by some children who had been sexually abused, and that the victim's behavior was consistent with sexual abuse, as well as the victim's mother's testimony that the victim engaged in masturbation and other sexual behavior. Therefore, Petitioner failed to demonstrate that counsel's failure to object to the comment was unreasonable.

3–4.   Comments on time frame during which sexual abuse occurred[5]

The third allegedly objectionable comment was the prosecutor's comment that Dr. Keefe stated the condition of the victim's hymen could not have been caused by sexual abuse during a seven to eight-week period without severe symptoms, such as blood in her clothes and pain (Doc. 1 at 6f).  Petitioner contends this was a mischaracterization of the evidence because Dr. Keefe's actual testimony was that the condition of the hymen could not have been caused by abuse during a two-week period even with multiple daily episodes.

Dr. Keefe's testimony on this issue included the following:

Q [by the prosecutor].  Could you put a time line on what you observed . . . on the least amount of time it would take to have caused that severe of damage?

A.     The changes that I saw compared to others who have been injured and that we've seen and have been written up in the literature, these changes would have had to have happened over a time line of months.  When I saw her there was no, what I could recognize, as new changes, anything that's happened in the most recent week or two-week period.  It could have been months of time or could have been going on for years.  Once the hymen is gone you've lost your time line.
. . . .

Q. [by defense counsel].  I believe you testified that there were no new changes.  Did you see any evidence during your examination of any abuse within say a twenty-four hour period?

A.     No, no like vaginal bleeding or bruises or scrapes.  Once the rim of the hymen is gone there's not a lot that will show even with recent abuse, but I did not see any recent abuse within twenty-four hours that I could detect.

Q.     You testified also that this . . . the results of what you saw, would be something that occurred over a long period of time with many episodes?

_____

[5]The time frame during which the sexual abuse occurred was a significant issue because the defense attempted to create reasonable doubt as to the perpetrator of the abuse by suggesting that Michael Primous, the victim's nephew who lived in South Carolina, had an opportunity to abuse the victim during the victim's two-month visit to South Carolina in December of 1998 through January of 1999.  The amended information alleged that Petitioner sexually battered the victim, by vaginally penetrating her with his penis or fingers, on or about February 1, 1998; that he committed lewd and lascivious assault on the victim, by fondling her sexual organs, between February 1, 1998 and October 1, 1999; and that he committed lewd and lascivious molestation of the victim, by touching her breasts or genitals, between October 1, 1999 and February 3, 2000 (*see* Doc. 13, Ex. A).

A.      Yes.

Q.      Okay.  Would it make any difference in your timeframe, which I believe you said a period of months or at least many weeks, if the abuse was on a daily basis as opposed to a weekly basis?

A.      No.  I think once you get past a certain number of episodes when the hymen is finally gone, you lose any way to track.  I mean it's either partially there or it's gone.

Q.      And I guess that's my question to you, Doctor.  If the requisite number of episodes to attenuate the hymen had occurred in a two-week period, would you—could it have occurred within a two-week period if the abuse was once a day or twice a day or even three times a day?

A.      And I saw her soon after that?  It's hard to say because let's say it all happened within a two-week period, one would still see a lot of redness and inflammation before it went back to a normal coloration with the exception of the absence of the hymen. . . . If she had been abused daily for like two weeks, straight, I'm not sure if that would have caused complete attenuation of the hymen or not, a complete absence.

Q.      But it could have?

A.      It possibly could have.

Q.      And if that two-week period had occurred some months prior to when you saw the child, would you have any way of knowing that?

A.      No.

Q.      So you can't really put a time line on it.  It would depend on the number of episodes and frequency of those episodes?

A.      Yes, it depends on number, and I can't say—you can never say it's going to be—ten times of penetration is going to cause it.  Every child's membrane is different.  The technique, if your will, or what is done during the sexual abuse encounter matters, so when we talk about the time line, what we know is, in medical examinations, this is small changes over many weeks or months will [sic] eventually wear away the hymen, and that's all we know.

. . . .

Q [by the prosecutor].  In this two-week time period, what it sounds like if it hadn't been two weeks we would have had a whole lot of other physical evidence to—

A.      Yes.  That frequency of sex abuse, the child would have had rawness and pain that, you know, any normal child would have told somebody or some caretaker would have seen on a diaper change or she would have had pain when she was urinating and it would have been a whole lot different than the small gradual changes that this change is consistent with.

Q.      So this is more consistent with over a long period of time?

A.      Yes.

. . . .

Q [by defense counsel].  Doctor, if the requisite number of episodes had occurred over say a two or two and a half month period of time over a year ago, would you expect to be able to determine that from your examination?

A.      No.  That many months past the alleged time, I can't put a time on that.

(Doc. 13, Ex. B at 229, 232–36).

The prosecutor's comment during closing argument was the following:

Dr. Keefe stood right here and told you this morning, "It's gone", and not gone from one time, or two times, or three, or four, or five, . . . from months of repeated abuse, over and over, a little bit at a time, wearing away the tissue a little bit at a time. There's no one else that could have done that but that man sitting right over there, no one.  If it had happened in the seven to eight weeks that they were in South Carolina—he says seven to eight—the Earls say two to three to four.  Wanda—I mean Deborah thinks it might have been a couple of months, maybe three.  But taking the defendant's version alone, his recollection, seven to eight weeks, Dr. Keefe said no, not without some severe symptoms, blood, things in her clothes, pain. . . . [T]he reason you know it wasn't Michael is that it all started before then, before they went to South Carolina.

(*id.* at 322).

Although Dr. Keefe's testimony regarding severe symptoms was in response to questions regarding abuse over a period of time of two weeks or less, the prosecutor's argument was a fair characterization of Dr. Keefe's testimony that the absence of the child's hymen was consistent with

having been sexually abused over a long period of time, a period of months or years.  Therefore, defense counsel's failure to object to the comment was not unreasonable.

The fourth comment challenged by Petitioner is the prosecutor's statement, "We're relying on a medical fact it took months if not years for this to have occurred."  Petitioner states Dr. Keefe's actual testimony was that the condition of the child's hymen could not have been caused by weeks or months of abuse (Doc. 1 at 6f).  As with the previous comment identified by Petitioner, this fourth comment was a fair characterization of Dr. Keefe's testimony, set forth *supra*, regarding the time period over which the abuse likely occurred.  Therefore, Petitioner failed to demonstrate that counsel's failure to object to this comment was unreasonable.

     5.    <u>Comment on Deborah Durham's reason for staying with Petitioner</u>

The fifth allegedly improper comment was the prosecutor's description of the testimony of Petitioner's wife regarding why she stayed with Petitioner (Doc. 1 at 6f–6g).  The prosecutor said Petitioner's wife "broke down and told you she didn't want to believe it, she loved this man."  Petitioner contends this is a mischaracterization of the evidence because his wife's actual testimony was, "He made me believe that there was nothing going on with her, that he didn't do anything" (*id.*).

After Mrs. Durham testified regarding behaviors of the victim and Petitioner over a four-year period which caused her to be concerned that the victim was being sexually abused, the prosecutor then asked Mrs. Durham why she stayed in the house and allowed her children to be around Petitioner (Doc. 13, Ex. B at 43).  Deborah Durham responded as follows:

> A.    All the time I have been with him he made me believe that—excuse me.  (Witness crying)

> Q.    Okay, take your time.

> A.    He made me believe that there was nothing going on with her, that he didn't do anything.

(Doc. 13, Ex. B at 43–44).

The prosecutor's comment on this testimony included the following:

> If you remember on the stand yesterday in the other courtroom, I asked her,
> "Deborah, why did you stay in this situation?  Why didn't you take your family and
> run?  Why did you stay there?"  And you saw her.  It was hard for her to answer
> those questions and she broke down and she told you, she didn't want to believe it.
> She loved this man.  Even the defendant says that she's always thought he was
> smarter than her.

(*id.* at 323).  The prosecutor's comment was a fair characterization of Mrs. Durham's emotional

response to the question of why she stayed with her husband despite her concerns that her daughter

was being sexually abused.  Therefore, Petitioner failed to demonstrate that counsel's failure to

object to the comment was unreasonable.

6.      <u>Comment on children as victims</u>

The sixth allegedly improper comment was the prosecutor's comments, "I'm trying to make

everyone understand the defense counsel will try to make this child unbelievable, because she's a

retarded child.  That's not fair . . . that means she would always be a victim, and all children will be

victims."  Petitioner contends this comment improperly appealed to the emotions and "community

conscience" of the jury by taking emphasis off the evidence and placing it on the issue of

victimization of innocent children.

The trial transcript shows that during defense counsel's first closing argument, counsel

attempted to portray the victim as a child who could not appropriately respond to simple questions.

As an example, defense counsel noted that when the child was asked about brothers and sisters, she

responded by mentioning a keyboard (Doc. 13, Ex. B at 312).  Defense counsel then stated:

> You will be instructed by the court as well in this case that reasonable doubt
> may be found by you by the evidence, and I submit to you that the evidence in this
> case is full of reasonable doubt.  The only two witnesses—well, we only have one
> witness really, a young child, and because of her age, intellect, development, her
> testimony is for all intents and purpose [sic], valueless.

(*id.* at 316).

In response to this argument, the prosecutor argued the following:

> Mr. Tongue [defense counsel] doesn't want you to put much emphasis on [the
> victim's] hearsay statement. . . . on that video interview.  Well let's look at the video
> interview because it's in evidence and you get to see it.  [The victim], she knew very
> well what happened to her.  She repeatedly told everybody what happened to her.
> (PLAYED PORTION OF TAPE, STATE'S EXHIBIT 1.)

. . . .

FLEET:      . . . Mr. Tongue tells you she doesn't know the difference between sisters and brothers and a keyboard.  She just got through talking about playing and she started listing all the toys she had.  That was not a responsive answer to the question, but she's telling something she likes to talk about, she's telling about all her toys, "yeah, I have a keyboard."  She's not communicating directly with this person, not like we're used to communicating with people.  She's a four year old child, and I'm not going to stop all the way through this thing.  I'm trying to make everyone understand the defense counsel will try to make this child incredible or not believable, because she's a functioning four year old retarded child.  That's not fair.  That's not fair.  That means that she would always be a victim and all children would be victims.

(*id.* at 323–38).

From the context of the prosecutor's statement, it is evident that the prosecutor's purpose for stating, "That means that she would always be a victim and all children would be victims" was to dispute defense counsel's suggestion that a victim's young age and developmental problems automatically render the child's statements "valueless" or not credible.  The prosecutor's reference to children was not an attempt to appeal to the jury's emotions or to the "conscience of the community."  Therefore, Petitioner has failed to show that defense counsel had a meritorious basis for objecting to the comment.  *See, e.g.,* United States v. Newbern, 731 F.2d 744, 753–54 (11th Cir. 1984) (in drug case, prosecutor's repeated references to the fact that drugs being imported into the United States would be distributed to children was improper because the only purpose of comments was to prejudice defendants by suggesting to jury that defendants' action would result in drug being distributed to children of the community); United States v. Leaman, 546 F.2d 128 151 (5th Cir. 1977) (in drug case, prosecutor's repeated reference to drug problem in the community during questioning of defendant was improper); *see also* United States v. Bugros, 304 F.2d 177, 179 (2d Cir.1962) (in drug case, prosecutor's reference to children to suggest that defendant was a contemptible person who was unconcerned with the possible danger to his own children was improper).

### 7.      Prosecutor's questioning of Petitioner

The last allegedly improper comment identified by Petitioner is the prosecutor's question to him during cross-examination, "How long, Mr. Durham, does it take to put a finger in a vagina?

How long does it take to put your finger in your daughter's vagina?" (Doc. 1 at 6g).  Petitioner states this question was asked solely to inflame the jury, and there was no evidence or even an accusation that he engaged in such conduct, that is, sexually abused his daughter in that way, during the incident he was describing in his testimony (*id.*).

The prosecutor's comments occurred during cross-examination of Petitioner concerning an incident with a towel.  Deborah Durham had testified that she observed Petitioner walk out of the bathroom after taking a shower and, wearing only a towel and carrying his clothes, walk into a bedroom where the child victim was sleeping and shut the door (Doc. 13, Ex. B at 77).  Mrs. Durham stated that a friend who was at the house at the time commented that Petitioner was "taking [ ] so long," so Mrs. Durham entered the bedroom and saw the child sitting on the edge of the bed (*id.*).  Mrs. Durham asked Petitioner why he did not let the child out of the room when she awoke instead of letting her sit on the bed, but Petitioner did not respond (*id.*).

Petitioner described the incident during his direct testimony as follows:

> Well, you know, I went to take a shower.  As my custom is, after I come out of the shower I don't like to stay in the bathroom because it's steamy and hot and I tend to sweat after a shower.  So, you know, even before we had kids I would always leave the bathroom and go dry off in a cooler room, whether it's the living room or the bedroom or whatever.  Of course after we had children, you know, obviously, I'd, you know, have to, you know, go to a private place to dry off.  So at this particular time I would be going to our room, okay?
>
> Q [by defense counsel].  Which was also the room that [the victim] slept in?
>
> A.      Right.

(*id.* at 255).  The prosecutor cross-examined Petitioner regarding this testimony:

> Q.      So when Deborah testified she came in and saw [the victim] sitting on the edge of the table and you were standing there, you didn't see [the victim] sitting on the table?
>
> A.      On the table?
>
> Q.      Or on the bed or whatever Deborah was talking about.
>
> A.      She was sitting on the bed in the room that I was in.

Q.      She was sitting in the room where you walked into, your bedroom—

A.      Oh, this was after I was already dressed though.

Q.      But you didn't see [the victim]?

A.      I saw her at some point, but as far as when I went in the room to dry off.

Q.      So you weren't that cautious to as soon as you saw her, leave the room immediately?

A.      By the time I saw her I was already dressed.

Q.      But you're never alone with your daughter.  You just got through telling this jury that you do everything you can to stay out of being alone with your daughter, but yet you were alone with your daughter.  Are you exaggerating how much time you're alone with your daughter, or minimizing it, in order that this jury won't find you guilty of having done this stuff to your children, your daughter?

A.      You know, Mr. Fleet, when you say alone, my wife is two seconds away, okay?

Q.      Well how long, Mr. Durham, does it take to put a finger in a vagina? How long does it take to put your finger in your daughter's vagina?

A.      I don't know.

(*id.* at 290–91).

The purpose of the prosecutor's comment was to discredit Petitioner's suggestion that he could not have engaged in any sexual contact with his daughter while in the bedroom alone with her because his wife was nearby, which is proper cross-examination.  Although the prosecutor could have used less graphic language in asking the question, the question was not improper.

Based upon the foregoing analysis, the undersigned concludes that Petitioner failed to demonstrate that counsel's failure to object to any of the prosecutor's comments constituted deficient performance.  Therefore, the state court's denial of this claim was not unreasonable.

C.      Ground Three:  "Denial of effective assistance of counsel, failure to call arresting officer as witness in violation of 5th, 6th, & 14th U.S. Const. Am. rights to fair trial, due process and effective assistance of counsel.

Petitioner next contends his counsel rendered ineffective assistance by failing to call Detective Curtis Pond as a trial witness (Doc. 1 at 6).  Petitioner asserts Detective Pond would have testified that during his interview with the child victim prior to the "official" interview by the Child Protection Team (CPT), the child told Detective Pond that she told Petitioner, "Don't touch my vagina" (*id.*).  Petitioner states this testimony would have been helpful to the defense because the child did not make this statement to any other person involved in the case, and the defense could have argued that this "improper" interview by Detective Pond, who was not trained in the area of interviewing child victims, "tainted" the victim's subsequent "official" interview by the CPT and rendered it unreliable (*id.* at 6i–6j).  Petitioner additionally states defense counsel could have used the fact that Detective Pond interviewed the victim to exclude the victim's hearsay statement during the CPT interview, since the trial court's decision to admit the victim's hearsay statements was partially based upon the court's findings that the statements were reliable because no one had discussed the case with the victim prior to the CPT interview and no one had discussed the abuse in the presence of the child prior to the interview (*id.* at 6i).

Petitioner also states if defense counsel had called Detective Pond as a witness, Pond would have testified to the findings and diagnosis that Dr. Keefe relayed to him regarding the victim's physical condition, which contradicted Dr. Keefe's trial testimony regarding the child's condition.

1.      Clearly Established Supreme Court Law

The clearly established Supreme Court law applicable to claims of ineffective assistance of counsel is set forth *supra*.

2.      Federal Review of State Court Decision

Petitioner raised this claim as Ground Five in his Rule 3.850 motion (Doc. 13, Ex. H at 35–36).  The state court found as fact that defense counsel testified at the evidentiary hearing that he interviewed Detective Pond and knew that his testimony would not be favorable to the defense (Doc. 13, Ex. I at 186).  Based upon this testimony, the court determined that defense counsel made a tactical decision not to call Detective Pond as a witness (*id.* at 185).

Petitioner has failed to provide clear and convincing evidence to rebut the state court's factual finding that defense counsel's decision not to call Detective Pond was a tactical decision.  Furthermore, this finding is supported by defense counsel's testimony that he interviewed Detective

Pond, read his reports, knew the substance of his testimony, and determined that "it was not going to be at all favorable to the defense" (Doc. 13, Ex. I at 276). Therefore, the state court's finding is presumed correct, and the remaining issue with regard to counsel's performance is whether counsel's tactical decision was reasonable.

In this regard, Petitioner failed to demonstrate that Detective Pond's testimony would have been helpful to the defense. Petitioner states that Detective Pond would have testified that he interviewed the child prior to the CPT interview, but Petitioner has failed to show that such an interview occurred. Petitioner submitted with his reply brief a portion of a transcript of Detective Pond's interrogation of him (Petitioner), in which Detective Pond refers to "our" interview of the child and tells Petitioner that he asked the child what happened, and she responded that when she was sitting in Petitioner's lap she told Petitioner, "Don't touch my vagina" (Doc. 16, Ex. E). But the fact that Detective Pond told Petitioner that he interviewed the child does not make his statement true, especially since it is a well established law enforcement technique to exaggerate the evidence during an interrogation of an alleged perpetrator in an to attempt to obtain a confession. Furthermore, it is just as likely that Detective Pond was referring to the child's statements during the CPT interview, which Detective Pond observed but did not conduct, according to the trial testimony and the trial court's order regarding admission of the child's statements during the CPT interview (*see* Doc. 13, Ex. B at 124, Ex. I at 295). Likewise, with regard to alleged inconsistencies in Dr. Keefe's trial testimony and her written report following her medical examination of the child victim, the fact that Detective Pond told Petitioner during his interrogation that Dr. Keefe made certain findings does not make his statement true. Because Petitioner has failed to show that Detective Pond would have provided testimony favorable to the defense, he has failed to demonstrate that counsel's decision not to call Pond as a witness was unreasonable. Therefore, the state court's denial of this claim was not unreasonable.

    D.    <u>Ground Four: Denial of effective assistance of counsel, failure to object to expert testimony bolstering alleged victim's credibility in violation of 5th, 6th, 14th U.S. Const. Am. rights to fair trial, due process, effective assistance of counsel.</u>

Petitioner contends defense counsel should have objected to the following testimony by Dr. Napier on the ground that he improperly vouched for the credibility of the victim:

> You would see two dangers [of leading questions of a child that is functioning at a four-year-old age] that I can think of off the top of my head.  One danger is that the child will become aware of what that examiner is wanting and simply try to please the examiner and say whatever they think the examiner wants to hear rather than the child saying no, that's not right, which is what actually happened in this case.   The other is the danger that the child will start having—change their belief system and actually start believing, "Oh, yeah, that's right, this really did happen", and certainly will take away the credibility of what that child has to say, and I did not find that in this situation.

(Doc. 1 at 6 (citing trial transcript, Doc. 13, Ex. B at 172–73)).  Petitioner asserts that if counsel had

objected to this testimony, the outcome of his trial would have been different (*id.* at 6k).

### 1.   Clearly Established Supreme Court Law

The clearly established Supreme Court law applicable to claims of ineffective assistance of

counsel is set forth *supra*.

### 2.   Federal Review of State Court Decision

Petitioner raised this claim as Ground Seven in his Rule 3.850 motion (Doc. 13, Ex. H at

39–40).  The state court found as fact that defense counsel testified during the evidentiary hearing

that he did not believe that Dr. Napier's testimony "crossed any lines as far as bolstering the

witness" (Doc. 13, Ex. I at 186).  The court further found that the trial transcript of Dr. Napier's

testimony conclusively refuted Petitioner's claim that counsel performed deficiently (*id.*).

Upon review of Dr. Napier's testimony, Petitioner has failed to show that defense counsel

had a basis for objecting to the testimony on the ground that Dr. Napier improperly vouched for the

victim's credibility.   During direct examination, Dr. Napier testified that he conducted a

psychological evaluation of the victim, the purpose of which was to assess the intellectual and

developmental level of the child, and to explain to the trier of fact the child's frame of reference, her

developmental issues, what she would and would not understand, and her ability to communicate

in an intelligible fashion (Doc. 13, Ex. B at 149–50).  As part of his evaluation, he reviewed the

recorded interview of the child victim by the CPT, reviewed Dr. Keefe's report of her physical

examination of the child, reviewed police reports and reports of the child protection agency, spoke

with the child's therapist, interviewed the child, and conducted an intelligence test and an

assessment of the child's speech, communication, motor behavior, and other developmental areas

(*id.* at 150–51).  He testified that although the child was five years and seven months old chronologically, she was approximately four years old in terms of intellectual capacity and functioning (*id.* at 153).  Dr. Napier testified as to how the child's intellectual and developmental functioning would affect her ability to comprehend questions that were asked during an interview and how it would explain certain responses (*id.* at 154–55).  Dr. Napier commented specifically on the CPT interview of the child and observed that the interviewer sometimes asked questions that were too abstract for the child to understand (*id.* 156–59).  He also testified that there was no indication that the child was out of contact with reality, or that she could not determine the difference between reality and fantasy (*id.* at 160).  On cross-examination, Dr. Napier testified that he observed only one point in the CPT interview where the interviewer asked a leading question, but the child responded "no," which indicated that her answer was not prompted by the interviewer's question (*id.* at 167).  The prosecutor pursued the issue of leading questions on redirect, and it was in Dr. Napier's response to this issue that Petitioner alleges Dr. Napier improperly bolstered or vouched for the victim's credibility:

> Q [by the prosecutor].  Now what about the leading questions?  Mr. Tongue asked you about Greg's leading questions, and certainly you would agree that there are numerous leading questions in that interview.  Did—what is the danger, specifically, of leading questions of a child that's functioning at a four-year-old age?  What would we typically see if that danger was present in this interview?
>
> A.      You would see two dangers that I can think of off the top of my head.  One danger is that the child will become aware of what that examiner is wanting and simply try to please the examiner and say whatever they think the examiner wants to hear rather than the child saying no, that's not right, which is what actually happened in this case.  The other is the danger that the child will start having—change their belief system and actually start believing, "oh, yeah, that's right, this really did happen", and certainly will take away the credibility of what that child has to say, and I did not find that in this situation.  And there's also different kinds of leading.  I have seen terrible interviews where clearly the interviewer had an agenda of proving something.  I did not find that in this case.  I found the interviewer just trying to get information.  And the leading, in itself, I found to be innocuous and was not giving away what the interviewer or the purpose of the interview was.

(*id.* at 172–73).

Dr. Napier did not vouch for the child victim's credibility; he testified that he did not observe in the victim's taped interview the indications that are often present when a child's responses to questions are prompted or encouraged by the interviewer or otherwise colored by improper interviewing techniques, such as leading questions.  Additionally, any suggestion that Dr. Napier was vouching for the victim's credibility was eradicated by defense counsel's question to Dr. Napier posed very shortly after this testimony.  Defense counsel asked, "Doctor, you're not telling us that you absolutely can vouch and know for a fact the truth or veracity of any of this, can you?" (*id.* at 174).  Dr. Napier responded, "No, sir, I'm not a lie detector." (*id.*).  Therefore, if the comment identified by Petitioner left the jury with the impression that Dr. Napier determined that the child was telling the truth, this impression was unequivocally erased by his subsequent testimony that he could not make any such determination.

Petitioner failed to establish that defense counsel's failure to object to the testimony was an omission that no competent counsel would have made.  Additionally, Petitioner failed to demonstrate a reasonable probability that the outcome of the trial would have been different if counsel had objected to the comment.  Therefore, the state court's denial of his claim was not an unreasonable application of <u>Strickland</u>.

> E.   <u>Ground Five: "Denial of effective assistance of counsel:  failure to object to State's filing illegal, due process violating amended information in violation of 5th, 6th and 14th U.S. Constitutional Amendment rights to be advised of all charges, fair trial, due process, and effective assistance of counsel."</u>

Petitioner asserts that on December 6, 2000, five (5) days prior to the trial set for December 11, 2000, defense counsel filed a motion in limine to exclude hearsay evidence, noting that the State had not filed a notice of intent to use hearsay, which was required to be filed no less than ten (10) days prior to trial (Doc. 1 at 6a).  The next day, on December 7, 2000, the State filed an amended information adding the lewd and lascivious assault and molestation charges (Counts II and III) (*id.* at 6a, 6l).  The State also sought a continuance of the December 11 trial (*id.*).  Petitioner states the State filed the amended information as a delaying tactic to allow the prosecutor time to file a notice of intent to use hearsay because without the hearsay statements, the State would have lost at trial (Doc. 1 at 6a, 6l, 6m).  Petitioner contends defense counsel should have "objected" to the amended information on two grounds:  (1) the amended information  was illegal because it added new charges

without properly arraigning Petitioner on them or notifying him of them by providing him a copy of the amended information, and (2) the State filed the amended information solely to correct its fatal error of failing to file a timely notice of intent to use hearsay (Doc. 1 at 6l–6m; Doc. 16 at 12–14).

> 1.    Clearly Established Supreme Court Law

The clearly established Supreme Court law applicable to claims of ineffective assistance of counsel is set forth *supra*.

> 2.    Federal Review of State Court Decision

Petitioner raised this claim as Ground Nine in his Rule 3.850 motion (Doc. 13, Ex. H at 44–45).  The state court found as fact, based upon defense counsel's testimony at the evidentiary hearing, that Petitioner knew he would be going to trial on a capital sexual battery charge (Doc. 13, Ex. I at 186).  The court denied Petitioner's claim on the ground that it was without merit (*id.*).

Petitioner has failed to show that there is a reasonable probability that the result of the proceedings would have been different if counsel had opposed the State's filing an amended information.  The State may substantively amend an information, even over the objection of the defendant, unless there is a showing of prejudice to the substantial rights of the defendant.  *See* Dreske v. Holt, 536 F.2d 105, 107 (5th Cir. 1976) (amending information one day prior to trial did not deny defendant a fair trial where defendant made no attempt for a continuance and he failed to show he was prejudiced by the amendment); State v. Anderson, 537 So. 2d 1373, 1375 (Fla. 1989).  If defense counsel had opposed the amended information on the ground that it added new charges without properly arraigning Petitioner on them or providing him a copy of the amended information, the trial court would simply have scheduled an arraignment and directed defense counsel or the clerk to provide Petitioner his own personal copy of the amended information, thereby ensuring that Petitioner's substantial rights were not prejudiced.  Additionally, even if defense counsel had argued that the filing of the amended information was a delay tactic to facilitate the State's filing a timely hearsay notice, this was not a legally sufficient basis for the trial court to dismiss the amended information.  Obviously the State had sufficient evidence to substantiate the new charges as Petitioner was convicted of both of them, in addition to the original charge, at trial.  Furthermore, the delay of the trial did not prejudice Petitioner's substantial rights as Petitioner had no substantial

right to have the trial held on December 11.[6]  Therefore, even if the State filed the amended information and sought the continuance solely for the purpose of filing a notice of intent to use hearsay, Petitioner has failed to establish a reasonable probability that the trial court would have had a legal basis for denying the continuance or dismissing the amended information.  Because Petitioner has failed to show he was prejudiced by counsel's alleged error, the state court did not unreasonably apply <u>Strickland</u> in denying his claim.

> F.      <u>Ground Six:  "Denial of effective assistance of counsel:  failure to challenge trial court's unsupported finding of witness unavailability in violation of 5th, 6th and 14th U.S. Const. Amendment rights to confrontation, fair trial, due process and effective assistance of counsel."</u>

Petitioner contends defense counsel should have objected to the trial court's finding that the child victim was unavailable to testify at trial, which was a finding made by the trial court in support of its decision to permit the State to present hearsay statements by the victim at trial (Doc. 1 at 6a). Petitioner states defense counsel filed a motion in limine to exclude the child victim's hearsay statements on the ground that her statements were not reliable (*id.* at 6o), but counsel should have also argued that there was insufficient evidence that the victim's participation in the trial would result in a substantial likelihood of severe emotional or mental harm, which in a necessary showing under Florida Statutes section 90.803(23).  Petitioner states the only expert opinion as to the likelihood of severe emotional harm was Dr. Napier's report, in which he stated, "Due to the immediate response of the child protection team . . . she appears to be doing well and is recovering from the alleged trauma.  Likelihood of severe substantial harm is difficult to assess at this young age.  Her therapist is concerned about potential for harm . . . this psychologist agrees that there is always a likelihood of harm when a child is asked to testify against a parent.  She reports that she misses her father and they are bonded.  When she becomes old enough to realize she may have been instrumental in a possible conviction, harm is likely . . ." (*id.* at 6n).  Petitioner contends this is not

---

[6]Assuming that Petitioner was taken into custody on February 3, 2000, the last date of the offense conduct included in the amended information, his 175-day speedy trial deadline did not expire prior to January 22, 2001, the date his trial commenced, given that the deadline was extended by the continuances sought by the defense and granted by the trial court (Petitioner does not dispute Respondent's assertion that the defense sought and were granted four continuances between June 17, 2000 and November 13, 2000, and in the order granting the last continuance, the court set the December 11 trial date (*see* Doc. 13 at 37)).  *See* Fla. R. Crim. P. 3.191.

evidence of harm that would occur if the child testified but of future harm that may occur when the child realizes she had a role in the conviction, regardless of whether she testified in person or her statements were admitted as evidence through the hearsay exception (*id.*).

       1.     Clearly Established Supreme Court Law

The clearly established Supreme Court law applicable to claims of ineffective assistance of counsel is set forth *supra*.

       2.     Federal Review of State Court Decision

Petitioner raised this claim as Ground Eleven in his Rule 3.850 motion (Doc. 13, Ex. H at 48–49).  The state court found that the claim was conclusively refuted by counsel's testimony at the evidentiary hearing and the trial court's Order on Admission of Hearsay (*see* Doc. 13, Ex. I at 187, Ex. A at 90–91, Ex. B).

The record supports the trial court's determination.  At the post-conviction evidentiary hearing, defense counsel testified that he argued the issue of unavailability "vociferously" at the hearing on the State's notice of intent to use hearsay testimony and the defense's motion in limine to exclude the hearsay statements (Doc. 13, Ex. J at 533).  Petitioner failed to refute this evidence that defense counsel did, in fact, argue the issue of unavailability at the pre-trial hearing on the hearsay issue.  Furthermore, the trial transcript shows that even after the court ruled that the hearsay was admissible, defense counsel continued to object to admission of the child's hearsay statements to preserve the issue for appeal (Doc. 13, Ex. B at 38, 133–34, 146).  Petitioner has failed to show that counsel performed unreasonably with regard to the issue of unavailability of the victim as it related to the admission of her hearsay statements.   Therefore, he has failed to establish that the state court's decision was an unreasonable application of Strickland.

      G.    Ground Seven:  "Denial of effective assistance of counsel:  failure to investigate the individual alleged to have assaulted alleged victim and witnesses of this incident in violation of 5th, 6th, 14th U.S. Const. Amendment rights to fair trial, due process, and effective assistance of counsel.

Petitioner claims defense counsel performed ineffectively by failing to depose or otherwise investigate Michael Primous as the perpetrator of the crimes until just two weeks prior to trial (Doc. 1 at 6a, 6p).  Petitioner states that from the date of his arrest, he told counsel that the child victim had relayed an incident to him in which Michael Primous engaged in lewd behavior in the presence

of the victim (*id.* at 6p).   Petitioner states that counsel's failure to investigate this possible perpetrator resulted in insufficient cross-examination of Primous, as well as Primous's parents, the Earls (*id.*).   Petitioner states counsel should have investigated Primous's behavioral problems, previous episodes of "untoward" behavior toward other children, and other acts of aggression toward the child victim and her younger brother (*id.*).

       1.      Clearly Established Supreme Court Law

The clearly established Supreme Court law applicable to claims of ineffective assistance of counsel is set forth *supra*.

       2.      Federal Review of State Court Decision

Petitioner raised this claim as Ground Six in his Rule 3.850 motion (Doc. 13, Ex. H at 37–38).   The state court found as fact that there was no evidence admitted during the evidentiary hearing to support this allegation; therefore, the allegation was legally insufficient, and Petitioner was not entitled to relief (Doc. 13, Ex. I at 186).

Petitioner concedes that defense counsel deposed Michael Primous prior to trial, and that he cross-examined Michael at trial, specifically questioning him about an incident in which he was accused of pulling down his pants in front of the child victim (*see* Doc. 13, Ex. B at 115–20). Petitioner states counsel should have investigated Michael Primous's behavioral problems, previous episodes of "untoward" behavior toward other children, and other acts of aggression toward the child victim and her younger brother, including that according to Deborah Durham, Michael's stepfather told her that there had been previous episodes of Michael engaging in "untoward" behavior toward other children.   However, Petitioner failed to provide any evidence to support his speculation as to what counsel would have discovered if he had conducted more investigation into Michael Primous's alleged behavioral problems.   Additionally, Petitioner failed to show that any additional information would have been admissible at trial.   Therefore, Petitioner failed to establish a reasonable probability that the outcome of trial would have been different if counsel had further investigated Michael Primous's alleged behavioral problems (this is especially true in light of the evidence that the child was exhibiting signs of sexual molestation from the time she was one year old, the child had been sexually abused over a long period of time by the time she was five years old, and the visit to South Carolina occurred when the child was four years old and lasted only two months).   Therefore,

Petitioner has failed to demonstrate that the state court's decision was an unreasonable application of <u>Strickland</u>.

> H.    Ground Eight:   "Cumulative effect of errors amounted to fundamental error, undermining confidence in the result in violation of 5th, 6th, and 14th U.S. Const. Amendment rights to fair trial and due process, and ineffective assistance."

Petitioner asserts that any one of the previously asserted claims of ineffective assistance of counsel would be grounds for habeas relief; however, when considered cumulatively, defense counsel's errors rendered the trial fundamentally unfair (Doc. 1 at 6b, 6r).

Petitioner raised this claim as Ground Twelve in his Rule 3.850 motion (Doc. 13, Ex. H at 50), and the state court determined the claim was without merit (Doc. 13, Ex. I at 187).

"A defendant is entitled to a fair trial but not a perfect one."  <u>United States v. Ramirez</u>, 426 F.3d 1344, 1353 (11th Cir. 2005) (quoting <u>Lutwak v. United States</u>, 344 U.S. 604, 619, 73 S. Ct. 481, 490, 97 L. Ed. 593 (1953); <u>United States v. Adams</u>, 74 F.3d 1093, 1099-1100 (11th Cir. 1996)).  "[T]he 'cumulative effect' of multiple errors may so prejudice a defendant's right to a fair trial that a new trial is required, even if the errors considered individually are non-reversible."  <u>Ramirez</u>, 426 F.3d at 1353 (quoting <u>United States v. Thomas</u>, 62 F.3d 1332, 1343 (11th Cir.1995)).  The same principle of cumulative error may be applied to a post-conviction claim of ineffective assistance of counsel.  *See, e.g* ., <u>Fisher v. Angelone</u>, 163 F.3d 835, 852 (4th Cir. 1998); <u>United States v. Duong</u>, 250 Fed. Appx. 904, 2007 WL 2981435 (10th Cir. 2007); <u>United States v. Rooks</u>, 117 Fed. Appx. 237, 2004 WL 2799147 (4th Cir. 2004).  In any event, cumulative error analysis should evaluate only matters determined to be in error, not the cumulative effect of non-errors.  *See* <u>United States v. Barshov</u>, 733 F.2d 842, 852 (11th Cir. 1984) ("Without harmful errors, there can be no cumulative effect compelling reversal."); <u>Mullen v. Blackburn</u>, 808 F.2d 1143, 1147 (5th Cir. 1987) ("Mullen cites no authority in support of his assertion, which, if adopted, would encourage habeas petitioners to multiply claims endlessly in the hope that, by advancing a sufficient number of claims, they could obtain relief even if none of these had any merit.  We receive enough meritless habeas claims as it is; we decline to adopt a rule that would have the effect of soliciting more and has nothing else to recommend it.  Twenty times zero equals zero."); *see also* <u>United States v. Hall</u>, 455 F.3d 508, 520 (5th Cir. 2006); <u>Mancuso v. Olivarez</u>, 292 F.3d 939, 957 (9th Cir. 2002) (where there is no single

constitutional error, nothing can accumulate to the level of a constitutional violation); United States v. Hardy, 224 F.3d 752, 757 (8th Cir.2000); Angelone, *supra*; Moore v. Reynolds, 153 F.3d 1086, 1113 (10th Cir.1998); United States v. Rivera, 900 F.2d 1462, 1471 (10th Cir. 1990) ("[A] cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors."); United States v. Conteh, 234 Fed. Appx. 374, 2007 WL 1229043 (6th Cir. 2007).  Thus, Petitioner must show error with respect to at least two of his individual claims.

In the instant case, Petitioner has failed to establish that any of the violations he alleges were indeed errors, or that he was prejudiced by any of the alleged errors; therefore, the errors cannot support a cumulative effect claim.  Arguments that are inadequate individually are no more adequate collectively.  Moreover, the Supreme Court has not held that distinct constitutional claims may be cumulated to grant habeas relief.  Thus, it cannot be said that the state court's denial of this "cumulative effect" claim was contrary to or an unreasonable application of any Supreme Court decision so as to warrant relief under the AEDPA.

I.      Ground nine: "Ineffective assistance of appellate counsel: failure to properly appeal error preserved by trial counsel in violation of 6th and 14th U.S. Const. Amendment rights to due process and effective assistance."

Petitioner contends his appellate counsel performed ineffectively by failing to timely inform him that the State had filed an answer brief and failing to file a reply brief (Doc. 1 at 6b).  Petitioner states when he was finally provided a copy of the State's answer brief, he advised his appellate counsel of several points that should be raised in a reply brief, but it was too late (*id.*).  Petitioner further asserts that in addition to the issue raised by appellate counsel on appeal, specifically, that the trial court erred in relying upon other corroborating evidence in finding the child hearsay statements reliable, counsel should have challenged other aspects of the trial court's reliability determination which had been properly preserved for appellate review (*id.* at 6r–6w).

Respondent concedes that Petitioner exhausted this claim by attempting to present it in a petition for belated appeal (*see* Doc. 13 at 59).  Respondent contends, however, that Petitioner did not present his claim in the proper procedural vehicle because he presented it in a petition seeking a belated appeal instead of a petition alleging ineffective assistance of appellate counsel (*id.* at 62).

Respondent states Petitioner never filed a petition alleging ineffective assistance of appellate counsel, and because he failed to seek the appropriate remedy in state court, he is not entitled to federal habeas relief (*id.*).

In his reply, Petitioner contends even though he mistakenly titled his state habeas petition as a petition for belated appeal, the body of the petition addressed solely the issue of appellate counsel's failure to properly raise a meritorious issue, and he filed it under the appropriate procedural rule, Rule 9.141(c) of the Florida Rules of Appellate Procedure; therefore, the petition should have been construed as a petition alleging ineffective assistance of appellate counsel (Doc. 16 at 11).

The state court record shows that Petitioner filed a petition for belated appeal in the First DCA pursuant to Rule 9.141(c) of the Florida Rules of Appellate Procedure, and he raised substantially the same claim that he raises in this federal petition (*see* Doc. 13, Ex. G).  The First DCA denied the petition in a summary order; that order stated only "DENIED" (*id.*).

The Eleventh Circuit has held that, "where the existence of a procedural bar is clear and no state court has given any rationale for its summary disposition of the defendant's claim, we will not presume that 'had the [state court] explained its reasoning, it would have reached the merits of [the defendant's] claim.'"  Creed v. Department of Corrections, No. 08-12671, 2009 WL 1291866, at *1 (11th Cir. May 12, 2009) (quoting Kight v. Singletary, 50 F.3d 1539, 1545 (11th Cir. 1995) and citing Tower v. Phillips, 7 F.3d 206, 211 (11th Cir. 1993)).  In the instant case, it is not clear that a procedural bar existed in the state courts.  Under Florida law, a claim that appellate counsel rendered ineffective assistance of counsel is properly raised in a petition seeking belated appeal or alleging ineffective assistance of counsel.  *See* Alexander v. State, 855 So. 2d 243, 244 (Fla. 5th DCA 2003) (claim of ineffective assistance of appellate counsel must be raised in petition for belated appeal pursuant to Rule 9.141(c) of the Florida Rules of Appellate Procedure); York v. State, 891 So. 2d 569 (Fla. 2d DCA 2004) (granting belated appeal where petitioner filed petition pursuant to Rule 9.141(c) alleging ineffective assistance of appellate counsel and court agreed that appellate counsel was ineffective).  Petitioner filed his state petition pursuant to Rule 9.141(c), which provides for the filing of petitions seeking belated appeal or alleging ineffective assistance of counsel (*see* Doc. 13, Ex. G).  Furthermore, Petitioner's petition was based entirely upon his allegations of

ineffective assistance of appellate counsel.  Moreover, an appropriate remedy ordered by a state court granting a petition alleging ineffective assistance of appellate counsel is a belated appeal, *see* Fla. R. App. P. 9.141(5)(D), which is the remedy Petitioner sought in his state petition.  *See* Santiago v. State, 962, So. 2d 416 (Fla. 2d DCA 2007) (granting petition seeking belated appeal of conviction on basis of alleged ineffective assistance of appellate counsel and instructing trial court, within thirty days from issuance of mandate, to appoint appellate attorney to file brief limited to issue that appellate court determined should have been raised by counsel in first appeal); Barnes v. State, 932 So. 2d 589 (Fla. 5th DCA 2006) (appropriate remedy for petitioner's success on claim of ineffective assistance of appellate counsel was grant of belated appeal).  Therefore, there is no basis to conclude that Petitioner's claim was procedurally barred.

In light of Respondent's concession that the claim was exhausted, as well as this court's determination that the First DCA did not apply a procedural bar but reached the merits of the claim, the court will determine whether Petitioner is entitled to relief under the AEDPA.

1.   Clearly Established Supreme Court Law

The standard applicable to claims of ineffectiveness against trial counsel apply equally to claims of ineffective assistance of appellate counsel.  Johnson v. Alabama, 256 F.3d 1156, 1187 (11th Cir. 2001) (citations omitted).  To prove ineffective assistance of appellate counsel, a petitioner must show (1) counsel's performance was constitutionally deficient, and (2) he was prejudiced as a result.  Strickland, 466 U.S. at 694. "The purpose of ineffectiveness review is not to grade counsel's performance." Chandler, 218 F.3d at 1313 (citing Strickland).  In evaluating counsel's performance, reviewing courts must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable, professional assistance.  *Id.* at 1314.  An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption of effective representation.  Where the record is incomplete or unclear about counsel's actions, it will be presumed that he did what he should have done, and that he exercised reasonable professional judgment.  *Id.* at 1314 n.15.

In order to meet the prejudice prong of the Strickland standard, the petitioner must allege more than simply that the unreasonable conduct might have had "some conceivable effect on the outcome of the proceeding."  Strickland, 466 U.S. at 693.  Instead, the petitioner must show a

reasonable probability exists that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Without support in the record, bare allegations that the petitioner was prejudiced by counsel's performance are not sufficient. Smith v. White, 815 F.2d 1401, 1406–07 (11th Cir. 1987). In applying Strickland the court may dispose of an ineffective assistance claim if the petitioner fails to carry his burden on either of the two prongs. Strickland, 466 U.S. at 697.

It is difficult to win a Strickland claim on the grounds that appellate counsel pressed the wrong legal arguments where the arguments actually pursued were reasonable in the circumstances, as counsel must be "highly selective about the issues to be argued on appeal. . . ." Johnson, 256 F.3d at 1188 (quoting United States v. Battle, 163 F.3d 1, 1 (11th Cir. 1998)).

2.     Federal Review of State Court Decision

As previously discussed, Petitioner raised this claim in his petition for belated appeal (Doc. 13, Ex. G). The state court's summary denial included no findings, so it is appropriate to conclude that the state court found no deficient performance, or no prejudice, or both. This court must therefore determine whether the state court's ruling resulted "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1). The state court did not specifically cite to any United States Supreme Court case for the standard to be applied in resolving Petitioner's claim. However, as previously noted, a state court is not required to cite United States Supreme Court cases or even be aware of the cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." Early, 537 U.S. at 8. Although the state court denial of Petitioner's claim without opinion provides no guidance to this court in determining the rationale for its decision, this court must still defer to the state court decision unless review of the record shows that decision to be unreasonable. *See* Helton v. Secretary for Dept. of Corrections, 233 F.3d 1322, 1326–27 (11th Cir. 2000); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000); Hannon v. Cooper, 109 F.3d 330, 335 (7th Cir. 1997).

Petitioner cannot meet the demanding Strickland test. Appellate counsel's choice regarding which issue to press on appeal was adequate in the circumstances. Petitioner argues that, rather than the allegedly weak argument actually raised by appellate counsel—that the trial court erred in relying upon other "corroborating evidence" in finding that the child hearsay statements were

reliable—appellate counsel should have asserted the more substantial claim presented in this federal petition, that is, that the trial court's findings of reliability were insufficient under state law and unsupported by the record (*see* Doc. 1 at 6s–6w).  In support of his argument, Petitioner contends that under state law, there are twelve indicators of reliability, and of those twelve, nine indicators dictated against reliability (*id.* at 6s–6t).  Petitioner further argues that the trial court's findings were refuted by the record, actually militated against reliability, or were contrary to the facts (*id.* at 6t–6w).        For the State to use, at trial, evidence of a child victim's out-of-court statements describing sexual abuse, the trial court must find that the hearsay statements are reliable.  *See* Fla. Stat. § 90.803(23)(a); <u>State v. Townsend</u>, 635 So. 2d 949, 954 (Fla. 1994).  Section 90.803(23) provides:

> (a)  Unless the source of information or the method or circumstances by which the statement is reported indicates a lack of trustworthiness, an out-of-court statement made by a child victim with a physical, mental, emotional, or developmental age of 11 or less describing any act of child abuse or neglect, any act of sexual abuse against a child, the offense of child abuse, the offense of aggravated child abuse, or any offense involving an unlawful sexual act, contact, intrusion, or penetration performed in the presence of, with, by, or on the declarant child, not otherwise admissible, is admissible in evidence in any civil or criminal proceeding if:

> 1.  The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability.  In making its determination, the court may consider the mental and physical age and maturity of the child, the nature and duration of the abuse or offense, the relationship of the child to the offender, the reliability of the assertion, the reliability of the child victim, and any other factor deemed appropriate; . . .

Fla. Stat. § 90.803(23).  In <u>Townsend</u>, the Florida Supreme Court held that other factors which may be considered include, but are not limited to, a consideration of the statement's spontaneity; whether the statement was made at the first available opportunity following the alleged incident; whether the statement was elicited in response to questions from adults; the mental state of the child when the abuse was reported; whether the statement consisted of a child-like description of the act; whether the child used terminology unexpected of a child similar age; the motive or lack thereof to fabricate the statement; the ability of the child to distinguish between reality and fantasy; the vagueness of the accusations; the possibility of any improper influence on the child by participants involved in

a domestic dispute; and contradictions in the accusation. 635 So. 2d 957–58. The court further held that a court is to use a totality of the circumstances evaluation in determining reliability. *Id.* at 958.

A trial court's determination that a statement bears sufficient indicia of reliability under the statute is reviewed for an abuse of discretion. Perez v. State, 536 So.2d 206 (Fla. 1988). In Canakaris v. Canakaris, 382 So. 2d 1197 (Fla. 1980), the Florida Supreme Court issued guidelines for review of a judge's discretionary power. The court stated, "If reasonable men could differ as to the propriety of the action taken by the trial court, then the action is not unreasonable and there can be no finding of an abuse of discretion. The discretionary ruling of the trial judge should be disturbed only when his decision fails to satisfy this test of reasonableness." *Id.*

A review of Florida cases in which appellate courts have analyzed the trial court's reliability determination for an abuse of discretion is helpful in assessing whether Petitioner's appellate counsel performed deficiently by failing to raise the reliability issue on appeal. In Mathis v. State, 682 So. 2d 175 (Fla. 1st DCA 1996), the trial court made the following findings to support its determination that the child victim's hearsay statements were reliable: (1) the child had testified; (2) the child could "be led"; (3) the child accurately described to Officer Wright the route to the location where the offenses allegedly were committed; (4) the child knew the defendant; (5) the child testified "clearly," but "somewhat hesitantly"; (6) the child "is able to relate"; (7) the child's testimony was "weak"; (8) the child had "a hard time understanding things," such as "before and after"; and (9) Officer Wright had dealt with similar cases in the past, and was trained not to try to put words into a child's mouth. *Id.* at 179. The First DCA determined that these findings were legally insufficient because although the last finding was relevant to the "circumstances" under which the statements were made, it was difficult to perceive how the remaining findings had a bearing on the determinative issue—whether "the time, content, and circumstances of the statement[s] provide sufficient safeguards of reliability." *Id.* The court opined that while it might be argued that the finding that Officer Wright corroborated the accuracy of the child's description of the route to the location where the alleged offenses were committed was relevant, the reliability of the statements must be determined independent of any corroborating evidence. *Id.* (citing State v. Townsend, 635 So. 2d 949, 957–58 (Fla. 1994)). The First DCA further found that to the extent the remaining findings were intended by the trial court to refer to "the time, content, and

circumstances of the statement[s]," it seemed that they militated against a finding of reliability, rather than in favor of one. *Id.*  Moreover, the trial court addressed few, if any, of the non-mandatory factors listed in either section 90.803(23)(a) or <u>Townsend</u>.  *Id.*

In <u>In Interest of R.L.R.</u>, 647 So. 2d 251 (Fla. 1st DCA 1994), the trial court made the following findings to support its determination that the child victim's hearsay statements were reliable:

> Now, I would find that her description of the ability of the child to relate incidents, occurrences, her first interview, spontaneous statements that she has validated by use of questions which are phrased so as to try to make sure that a child is either understanding or that it might put it in a different perspective to reply to see if her responses are consistent-

> So, I would find from within this professional setting that there has been a sufficient predicate now laid for the admission of statements to this witness.

> I would also find, based upon her testimony, that the statement of the child made to Dr. Macyko, combined with the doctor's testimony about that she was not using leading questions and the manner of questioning the child, again, I would find certainly reliable.

> And so, I would overrule your objection as to those statements previously given.  Also as to, I guess it was to the one statement from Ms. Wilburn in reply to Ms. Carlin's question about why [R.R.] was at the hospital, I had reserved ruling on that and again from the totality of this, I would find that that also would be admissible and overrule your objection on that.

> Okay.  So, I find the child to be unavailable to testify.  And now, again, I think we also have to further evaluate the time, content, and the circumstances as we're going through this, and so that is certainly subject to further-but at this time, I'm satisfied, unless something else develops, that these statements are admissible.

*Id.* at 253.  No other findings were made pursuant to section 90.803(23).  *Id.*  The First DCA determined that the court failed to make the specific findings of fact required by section 90.803(23); therefore, the court erred by admitting the child hearsay statements.  *Id.*

In <u>Garcia v. State</u>, 659 So. 2d 388 (Fla. 2d DCA 1995), although the trial court made some factual findings with respect to reliability, the Second DCA determined that they were legally insufficient.  In its findings, the trial court recited the age of the child and summarily determined,

without explanation, that she was mentally above average and highly credible, that her statements were made over a one-year period of time, that her statements were not vague but materially consistent with the crime charged, and that her statements were in her own words, thus indicating no outside influence.  *Id.* at 391.  The trial court also concluded, without further explanation, that "[t]he time, place, and occurrence of the statements made by the child victim to each of the respective witnesses were appropriate[,]" and that these statements satisfied "the threshold criteria test of [section] 90.803(23) for being trustworthy."  *Id.*  The appellate court determined that the trial court's "limited, summary findings" were insufficient to satisfy the case-specific requirements of section 90.803(23) because they failed to address why the time, content, and circumstance of each individual statement provided sufficient safeguards of reliability.  *Id.* at 392.

In Kertell v. State, 649 So. 2d 892, 893 (Fla. 2d DCA 1995), the trial court referred to the remoteness of the time of the incident (which occurred about two and one-half years prior to the trial) and the later reporting time, but indicated without further explanation that the remoteness factor was overcome by the apparent candor of the child's statements, the graphic nature of her description of the sex acts, and the neutral examination conducted by the child protection team investigator and the detective.  *Id.* at 893.  The Second DCA held that the trial court's summary findings were inadequate to permit admission of the hearsay statements.  *Id.* at 894.

In Tussey v. State, 793 So. 2d 1188 (Fla. 5th DCA 2001), the trial court made the following ruling with regard to admissibility of the child victim's hearsay statements:

> THE COURT:  As far as the reliability and trustworthiness of the statement, the Court finds after having read the depositions, listening to the testimony of [J.S.] this morning, and just listening to the testimony that the state elicited at this hearing on the hearsay rule, that there are—there exists consistencies and reliability and trustworthiness and that's between the statements that were made and the time and content of the statements for them to be admissible according to this Court.  I know what you are saying, Mr. Abercrombie [defense counsel].  He is a child and both of you did a very good job this morning, but when you sit back and listen, there were a couple times he said he was watching TV, and I have in my notes he was also watching TV by the bureau.  I mean, I don't know the configuration of the house, but evidently it is all very close.  I mean, where he was standing by this bureau, which evidently is next to the kitchen, you can also see the TV.
>
> [DEFENSE COUNSEL]:  No.

> THE COURT:  Well, you can gather that from the way the testimony goes.  No one drew a picture, so I can't picture it in my mind.  And then he answered that–a lot was in response to questions that you asked him, so I don't think that that's enough confusion or enough inconsistency for it not to be reliable.

*Id.* at 1190.  Comparing the trial court's ruling to the rulings analyzed in <u>Hopkins</u>, <u>Mathis</u>, <u>Kertell</u>, <u>Garcia</u>, and <u>Weatherford</u>, *supra*, the Fifth DCA held that the trial court's ruling was no more comprehensive than the rulings in those cases and, therefore, was insufficient under section 90.803(23).  *Id.*

In contrast, in <u>M.H. v. Dep't of Health & Rehabilitative Serv.</u>, 703 So. 2d 1195 (Fla. 1st DCA 1997), the trial court addressed many of the factors concerning reliability articulated in <u>Townsend</u>, including the relative period of time in which the statements were made; the clarity, consistency, and detail of the statements; and the experience of the interviewers, as well as the fact that the statements were essentially nonleading in nature.  *Id.* at 1198.  The First DCA held that these findings were sufficient to support admissibility under section 90.803(23).  *Id.*

In <u>Ingrassia v. State</u>, 747 So. 2d 445 (Fla. 4th DCA 1999), the trial court found that the statements of the child victim were trustworthy for the following reasons:

> a.  The source, Det. Ulvang, is an attorney and seven year veteran with the Broward Sheriff's Office and a credible witness.
>
> b.  The statement was given to Det. Ulvang six days after the alleged crime was reported by the child to her mother.
>
> c.  The statement detailed incidents of unlawful sexual touch and genital contact covering a period of approximately two months.
>
> d.  The statement itself demonstrates narrative responses in terms common to a child of [the victim's] age, and a product of non-leading questions.
>
> e.  There is no evidence of a turbulent relationship between the child and the Defendant.  Quite to the contrary, the child maintained a harmonious relationship with the Defendant.
>
> f.  The reliability of the child's statement to Det. Ulvang has been established by clear and convincing evidence.

*Id.* at 446–47.  The Fourth DCA found that the trial court's findings were case-specific and supported by the record.  *Id.* at 447.  Therefore, the trial court did not abuse its discretion in admitting the statements because "[t]he record reflects that the court cumulatively weighed numerous potential facts, such as time, circumstances, credibility, demeanor."  *Id.* at 447 (quoting Reynolds v. State, 660 So. 2d 778 (Fla. 4th DCA 1995)).

In the instant case, the trial court entered an order admitting the child victim's hearsay statements after conducting a hearing, and the court based its decision upon the testimony of witnesses, argument of counsel, and upon review of the videotape of the child's interview by the Child Protection Team (*see* Doc. 13, Ex. I at 293).  In the written order, the court made factual findings with regard to child hearsay statements by the victim to Deborah Durham, Greg Boyd, Dr. Keefe, and Debbie Hollis (*id.* at 294–301).

The court's order addressed the child hearsay statements of the victim to her mother, Deborah Durham (*id.* at 294–95).  The court found that the statements were spontaneous, were not the result of leading or suggestive questioning, were in response to a situation occurring to the victim at the time of the statements, the source of the statements did not show signs of a lack of trustworthiness, no motive to fabricate the statements appeared to be present, the statements were immediately upon the abuse occurring and clearly indicated what occurred to the victim at that particular time, and the statements were otherwise admissible as a spontaneous statement, pursuant to section 90.803(1) of the Florida Statutes (*id.*).

The court's order addressed the child hearsay statement by the child victim to nurse Greg Boyd, which were videotaped and observed by Karen Henderson and Curtis Pond (*id.* at 295–97).  The court found that the statements were spontaneous and in response to questions by Mr. Boyd, included sufficient details of the nature of the abuse, clearly identified the perpetrator, and were consistent throughout the interview about the nature of the abuse, although the court noted that there were "minor inconsistencies" (*id.* at 295–96).  The court stated that the statements were consistent with regard to the identity of the perpetrator, the questioning was not overly suggestive or leading, the child was aware during the interview and understood that she was being asked about something that happened to her, the child adequately related what happened to her to the point that the listener could clearly understand what she was reporting, there was no evidence of coaching, and the

interview was conducted in a relaxed but controlled setting and was conducted privately and insulated from the possibility of improper influence (*id.*).  Additionally, the court found that there were no improper discussions of the abuse in the presence of the child, the child expressed herself in a manner that the listener was able to clearly understand, and there was no showing that the child or anyone fabricated the allegations (*id.* at 297).  The court also found that there was expert testimony that the child was sexually abused, and the medical findings showed that the child's genitalia were damaged and indicated she had been sexually abused over an extensive period of time (*id.* at 297) (these findings were the basis of appellate counsel's argument on appeal).

The court's order addressed the child victim hearsay statements made by the victim to Dr. Keefe (*id.* at 298).  The court found that the hearsay statements were spontaneous, were not the subject of suggestive questioning, the child's statements were clear in regard to the type of abuse and the identity of the perpetrator, and that the statements were otherwise admissible as statements for purposes of medical treatment, pursuant to section 90.803(4) (*id.*).

The court addressed the child hearsay statements made by the victim to a mental health counselor, Debbie Hollis (*id.*).  The court noted that the statements were made over the course of sixteen therapy sessions with Ms. Hollis, were made during non-directive therapy play, were not the subject of leading or suggestive questioning, and were made at the victim's own volition and in response to non-leading questions (*id.* at 298–99).  The court found that the child was clear in her statements, clearly identified her abuser, the setting was such that no one else was present and there was no opportunity for anyone to exercise undue influence over the child, there appeared no motive for the child to fabricate her statements, there was no showing that the child fabricated the statements, the child's affect and demeanor were appropriate for the setting and content of what she was saying, and the child did not appear to have cognitive or developmental disabilities to render the statements untrustworthy, although the court noted that the child was developmentally delayed to some extent and she appeared emotionally to be about the age of four notwithstanding her chronological age of five (*id.* at 299–300).

The court's order addressed the independent reliability of the child victim hearsay statements as a group (*id.* at 300–01).  The court found that all of the child's hearsay statements to all of the proffered witnesses were consistent regarding the sexual abuse she experienced and the identity of

the perpetrator, and there was no showing that the child made any inconsistent statement regarding where she was touched on her body and who touched her (*id.* at 300) (these findings were also the basis of appellate counsel's argument on appeal). Additionally, the court found that there was no showing that the child was coached or that her statements were the result of suggestive questioning or undue pressure, that there was no showing that the child had a motive to lie or fabricate the statements, that there was no showing that any other person had a motive to lie or fabricate the statements, and that all persons involved in the investigation seemed to be aware of the potential of improper suggestive comments and avoided discussing the nature of the allegations or the specifics of the abuse in the presence of the child victim (*id.*). Based on these findings, the court held that the child victim hearsay statements were sufficiently reliable and trustworthy to be admitted under the child victim hearsay exception pursuant to § 90.803(23), Fla. Stat. (*id.* at 301).

Initially, Petitioner has failed to show that his appellate counsel's decision to pursue the issue that he presented on appeal was unreasonable. The issue presented by counsel was whether the trial court erred in relying upon other "corroborating evidence" in finding the child hearsay statements reliable under § 90.803(23) (*see* Doc. 13, Ex. D). This issue had arguable merit since even the State acknowledged in its answer brief that the use of corroborative evidence to determine reliability and trustworthiness of hearsay statements is proscribed by Florida courts and the United States Supreme Court (*see* Doc. 13, Ex. E at 13) (citing State v. Townsend, 635 So. 2d 949, 957 (Fla. 1994); Idaho v. Wright, 497 U.S. 805, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990)). As discussed *supra*, it is difficult to win a Strickland claim on the grounds that appellate counsel pressed the wrong legal arguments where the arguments actually pursued were reasonable in the circumstances, as counsel must be "highly selective about the issues to be argued on appeal. . . ." Johnson, 256 F.3d at 1188

Additionally, although Petitioner asserts approximately thirty-nine arguments that appellate counsel should have raised on direct appeal with respect to the trial court's reliability determination, upon consideration of each of his claims and the trial court's findings in support of its reliability determination, the undersigned concludes that Petitioner has failed to demonstrate that appellate counsel's failure to pursue these arguments was unreasonable. As to some of the arguments suggested by Petitioner, he has failed to demonstrate that appellate counsel had record support for arguing that the trial court abused its discretion. For example, Petitioner contends appellate counsel

should have argued that the child's statements to Deborah Durham "may not be trustworthy" due to "evident" marital discord (*see* Doc. 1 at 6s).  However, the fact that Petitioner and his wife had experienced marital discord does not demonstrate that the trial court's determination that Ms. Durham "did not show any signs of a lack of trustworthiness" was unreasonable.  Additionally, Petitioner contends appellate counsel should have argued that the child's statement was not made at the first available opportunity following the alleged incident because Dr. Keefe stated that the abuse had been occurring for a long period of time prior to the first report (*id.*).  However, in light of the circumstances of the child's first report, Petitioner failed to show that the record supported an argument that the child had a prior opportunity to report the previous abuse.  The child's first statement regarding the abuse was made to Deborah Durham, the child's mother, upon Mrs. Durham's questioning the child after she heard the child say "Don't touch my vagina" to Petitioner while the child was sitting in his lap.  Petitioner does not allege that there was any evidence that Ms. Durham had previously questioned the child about sexual abuse, or that the child otherwise had an opportunity to report prior abuse.  Furthermore, the record establishes that the child had a developmental age of four years when she was interviewed by Dr. Napier just after the first report (*see* Doc. 13, Ex. B at 154), and the evidence showed that the abuse occurred over a long period of time prior to that.  Therefore, Petitioner failed to show that appellate counsel had a reasonable basis for arguing that the child had the ability, let alone a previous opportunity, to report the abuse. Petitioner also contends appellate counsel should have argued that the child's mental state at the time of the first report showed no evidence of the "typical upset" associated with this type of case (Doc. 1 at 6t), but he failed to show that appellate counsel had record support for an argument that an upset mental state was typically associated with this type of case.  In fact, Dr. Napier testified regarding several reasons the victim may not have displayed upset or trauma (*see* Doc. 13, Ex. B at 169–72).  Therefore, counsel's failure to raise this issue was not unreasonable.  Petitioner contends appellate counsel should have argued that the child used un-childlike terminology (*id.*); however, the record shows that the child's mother testified that she taught the child to use terms such as breasts, vagina, and butt when referring to her body parts (Doc. 13, Ex. B at 30).  Therefore, appellate counsel had no reasonable basis for challenging the trial court's reliability determination on this ground.  Petitioner next contends appellate counsel should have argued that there was no

evidence the child was able to distinguish lie from truth and fact from fantasy (Doc. 1 at 6t).
However, Dr. Napier testified at trial that the victim could determine the difference between reality
and fantasy, there were no indications of a mental illness, and there was no indication that the victim
was out of contact with reality (Doc. 13, Ex. B at 160).   Therefore, it was not unreasonable for
appellate counsel not to argue this point. Petitioner contends appellate counsel should have argued
that the child's statements were vague and inaccurate, but Dr. Napier explained that some of the
child's responses to questions by Greg Boyd were a result of Mr. Boyd's asking questions that were
too abstract or unclear for the child to understand (Doc. 13, Ex. B at 156–60).   Petitioner also
contends appellate counsel should have argued that there was a possibility of improper influence
from Greg Boyd's asking leading questions (*see* Doc. 1 at 6t), but Dr. Napier testified that Greg
Boyd's interview of the child victim was not tainted with leading questions (Doc. 13, Ex. B at
167–68, 172–73).   Therefore, it was not unreasonable for appellate counsel not to argue this point.
Petitioner next contends appellate counsel should have argued that the child made many
contradictory and inconsistent statements (*see* Doc. 1 at 6t), but Petitioner provides no specific
examples of such.   Furthermore, Dr. Napier testified that the child was "very very consistent" (Doc.
13, Ex. B at 174).   Additionally, based upon the trial testimony of Deborah Durham, Dr. Napier,
Debbie Hollis, and Dr. Keene, as well as the comment by Dr. Napier concerning the child's
statements to Greg Boyd, the child consistently stated that Petitioner touched her vaginal area,
backside, and chest.   Therefore, it was not unreasonable for appellate counsel not to challenge the
trial court's reliability determination on these grounds.   Petitioner also contends appellate counsel
should have argued that the child exhibited a lack of mental competence, therefore, the trial court
should have explored the competency issue as it related to the reliability of her statements (Doc. 1
at 6t).   However, Petitioner has failed to show there was any basis in the record for questioning the
child's mental competence.   Although Dr. Napier testified that the child was developmentally
delayed, he clearly stated that there were no indications of mental illness.   Therefore, it was not
unreasonable for appellate counsel to omit this argument on appeal.

Petitioner argues an additional thirty points of error in the trial court's reliability determination that appellate counsel should have raised on appeal.[7]  Although the undersigned has

---

[7]Petitioner raises the following additional thirty points of error he contends appellate counsel should have raised:

(a) the child's underdevelopment was not factored in to the performance of the interview;

(b) trial court improperly considered the corroborating evidence in it's [sic] ruling on reliability;

(d) the record clearly shows the statements of the child to Petitioner's wife, the child's mother, were not spontaneous, or even verbal, and subject to leading or suggestive questioning in that the 10 minute questioning by the mother before Petitioner left the house incurred no response at all [ ], after Petitioner told of the child's reference to Michael to the mother in child's presence [ ] and left, the mother asked the incompetent child, "What did he do:" to which the child responded by pointing down, not verbally [ ].  No sexual abuse was occurring at this time the initial alleged statement was supposedly made.  Thus it is unreasonable for the court to conclude the alleged statement was "in response to what was occurring at the time."  This is contrary to the facts and even to the very accusation of the State;

(d)(i) the source of the information, the child's mother, showed a lack of trustworthiness in withholding her knowledge of the lewd behavior of her nephew, which Petitioner stated from the very beginning was the subject matter of the child's statements, for four months [ ], which would have been favorable to Petitioner from the beginning by corroborating his response to police interrogatori [sic];

(d)(ii) the mother's failure to report this eyewitness [sic] lewd act against her child provides motivation to fabricate and have Petitioner, rather than her nephew, prosecuted so that she would not be prosecuted for failure to report such crime to police;

(d)(iii) the statements were not "made immediately upon the abuse occurring."  The evidence existed that an abuse occurred anytime within the statements alleged utterance [sic].  The State made no allegation or ever presented proof any abuse occurred at that time;

(d)(iv) the statements were not spontaneous, but as a result of questioning; therefore, not admissible as a spontaneous statement;

(e)(i) the trial court gives a contradictory finding that "the child's statements to Greg Boyd were spontaneous," and at the same time, "in response to questions by Mr. Boyd."  A spontaneous statement is one that is an internal response bereft of external solicitation;

(e)(iii) the court opines "the child clearly idenified [sic] who committed the abuse to her."  In reality, the interviewer struggled mightily and had to lead her with the question, "You said a man touched you?" [ ], when in fact the child had not said such a thing.  He had to further lead her to say "man name [sic] Bobby," then lead further to say "Bobby is Daddy" [ ].  Thus the child did not clearly identify Petitioner, rather the interviewer led the child to an identification;

(e)(v) the child was not "consistent throughout . . . about the identity of the abuser being her father," rather, she was led in stages to identify a "man", then "Bobby", then 22 minutes in to 28-minute interview to put 2 and 2 together that "Bobby is Daddy";

considered these remaining thirty points, they will not be individually addressed.  Not one of the

points was of sufficient merit for this court to conclude that appellate counsel's failure to raise it was

unreasonable.   Some points were repetitive of points already addressed in the court's main

---

(e)(xi) there was a critical discussion about the abuse prior to the interview with the child and Officer Curtis Pond, who claimed to have elicited the <u>initial alleged statement</u>, which not even <u>the child's mother</u> could.

(e)(xii) usage of the words breast and vagina by a mentally slow 5 year old is certainly not "consistent with that of a child being of age 5";

(e)(xvi & xvii) improperly considers corroborating evidence;

(f)(v) statements to Dr. Keefe are not admissible as medical diagnosis or treatment pursuant to hearsay exception F.S.A. 90.803(4) as the purpose of exam was <u>investigatory</u>, not strictly for medical diagnosis or <u>treatment</u> of medical problem;

(g)(i) the 16 therapy sessions were not videotaped as necessary to render these statement reliable;

(g)(iii) there is no way to verify there was no leading or suggestive questioning as a result of these 16 sessions not being recorded;

(g)(xii) contrary to the court's assertion that "the child appeared to have no cognitive or developmental disabilities that would make these statements untrustworthy," Dr. Napier's report shows that the child was "borderline" retarded.  A truth <u>not factored in when the CPT interview was done</u>.  Once again, it is well settled that competence (or lack thereof) should be considered in determining the statement's reliability;

(h) all of the child's hearsay statements' consistency with each other is not allowed to be considered in determining reliability;

(i) the child did make inconsistent statements regarding where she was touched;

(k) as shown in defense counsel's letter to the court [ ] and admitted to by Dr. Napier and the prosecutor himself [ ] there were a lot of leading questions;

(n) the court states that "<u>all</u> persons involved with the investigation seemed to be aware of the possibility of improper suggestive comments and <u>took precautions to avoid discussing the allegations and . . . abuse in the presence of the child</u>."  Not only is this not true, but also Officer Curtis Pond <u>discussed the allegations with the child before anyone else became involved</u> and improbably elicited the initial alleged statement (Don't touch my vagina) which no one else, including the child's own mother could elicit . . . ever [ ].

In addition, 8 other findings were repetitive (e(xv); g(ix); g(x); g(xii); j; k; l, and m).  Thus twenty-eight (a majority) of the court's findings support <u>unreliability</u>.

(Doc. 1 at 6t–6w) (emphasis in original).

Case No. 3:06cv196/RV/EMT

discussion of this claim and some lack record support, for example, Petitioner's claims based upon an alleged interview of the child conducted by Officer Curtis Pond. Some of Petitioner's arguments are simply based upon Petitioner's erroneous interpretation of the law. For example, Petitioner argues that Greg Boyd's statement, "No detailed, precise information was acquired [during the CPT interview] regarding dates, time, or places," renders all of the hearsay statements unreliable under the "time, content, and circumstances" language of section 90.803(23) (*see* Doc. 1 at 6s). However, section 90.803(23) refers to the "time, content, and circumstances of the <u>statement</u>" not the time, content, and circumstances of the incidents of abuse. Some of the points raised by Petitioner are irrelevant to the issue of reliability, for example, the argument that some of the trial court's findings were repetitive. Some of Petitioner's points are completely frivolous. For example, he twice asserts that appellate counsel should have argued that the trial court improperly considered corroborating evidence in its reliability determination, but the record is clear that appellate counsel raised this exact issue on appeal. Some of the arguments that Petitioner alleges should have been asserted on appeal were clearly not properly preserved, for example, the challenges to the trial court's determinations that the child's hearsay statements to Deborah Durham and Dr. Keefe were admissible under other exceptions to the hearsay rule.

Petitioner has failed to demonstrate that appellate counsel's failure to raise any of these other thirty-nine challenges to the trial court's reliability determination was unreasonable. Therefore, Petitioner has failed to demonstrate that the state court's denial of his ineffective assistance of appellate counsel claim was an unreasonable application of <u>Strickland</u>.

Accordingly, it is **ORDERED**:

The clerk of court is directed to change the docket to reflect that Walter McNeil is substituted for James McDonough as Respondent.

And it is respectfully **RECOMMENDED**:

That the petition for writ of habeas corpus (Doc. 1) be **DENIED**.

At Pensacola, Florida, this 26th day of May 2009.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations may be filed within ten (10) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**